UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DUANE REINCKE,

          Petitioner,                             Hon. Richard Alan Enslen

v.                                        Case No. 4:05-CV-110

BLAINE LAFLER,

          Respondent.

_____/


## REPORT AND RECOMMENDATION

This matter is before the Court on Reincke's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Reincke's petition be **denied**.


## BACKGROUND

As a result of his alleged sexual assault of then three-year-old K.I., Petitioner was charged with one count of First Degree Criminal Sexual Conduct. (Trial Transcript, Dec. 6, 2000, 203). Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

1

**Barbara Ann Morgan**

Morgan was K.I.'s babysitter in April 2000.  (Trial Transcript, Dec. 5, 2000, 26-28).

K.I. would typically arrive at her home at approximately 2:30 p.m.  (Tr. 28).  At approximately 8:00

p.m. Morgan would put K.I. to bed where she would remain until her mother arrived to take her

home.  (Tr. 28-29).  Morgan testified that she accompanied the children in her care to the bathroom

because "they can get into God knows what, and we don't need that."  (Tr. 33).

Morgan was babysitting K.I. on April 26, 2000.  (Tr. 29).  Because K.I.'s mother had

to work late, Petitioner picked up K.I. from Morgan's house on this particular night.  (Tr. 31).

Petitioner arrived at Morgan's house at approximately 11:10 p.m.  (Tr. 31).  Prior to Petitioner's

arrival, Morgan had accompanied K.I. to the bathroom.  (Tr. 32-33).  While so doing, Morgan was

able to observe K.I.'s underwear and genital area neither of which were bloody or otherwise unusual.

(Tr. 32-33).  Petitioner and K.I. left Morgan's home at approximately 11:25 p.m.  (Tr. 32).

**Andrea Imhof**

She is K.I.'s mother.  (Tr. 35).  K.I. was born on February 22, 1997, and, therefore,

was three years old as of April 26, 2000.  (Tr. 35-36).  Imhof met Petitioner in February 1999 and

soon thereafter moved into his house.  (Tr. 36-38).  According to Imhof, when she moved in with

Petitioner he "got along fine" with her daughter.  (Tr. 39).  She indicated that Petitioner played with

K.I. and took an "active role" in her potty training.  (Tr. 41).  According to Imhof, K.I. "always"

wore a nightgown and panties to bed.  (Tr. 41-42).

As of April 26, 2000, Imhof was working "mandatory" overtime, which required her

to work until 1:00 a.m. rather than her normal 11:00 p.m. quitting time.  (Tr. 39-40).  Petitioner was

aware of this change to Imhof's work schedule. (Tr. 40-41). Because of this change to her schedule, Imhof arranged to have Petitioner pick up K.I. from the babysitter that evening. (Tr. 41).

Imhof arrived home at approximately 1:10 a.m. on the morning of April 27, 2000. (Tr. 42). As Imhof pulled into her driveway she noticed that the light in her daughter's bedroom was on, which she thought was "strange." (Tr. 42-43). When Imhof entered her house, she observed her daughter "walking from her bathroom to her bedroom." (Tr. 43). Imhof immediately observed that K.I. "didn't have on any clothes." (Tr. 43). Imhof testified that this was unusual because K.I. never went to the bathroom completely naked. (Tr. 45). As soon as K.I. noticed Imhof, she "started crying immediately." (Tr. 43). K.I. "looked scared" and Imhof immediately "knew something was wrong." (Tr. 43). Imhof called to her daughter, but K.I. continued running into her bedroom. (Tr. 43). When Imhof entered K.I.'s bedroom, her daughter "looked like she was going to throw up." (Tr. 43).

Imhof knelt down to her daughter, at which point Petitioner "started pointing at" K.I. saying, "she's bleeding." (Tr. 43). Imhof saw blood on her hand as well as on her daughter. (Tr. 43). When Imhof examined K.I. she observed that "her little bottom was covered in blood." (Tr. 43-44). Imhof put a towel over the bleeding and she and Petitioner immediately drove to Oak Lawn Hospital in Marshall. (Tr. 44). On the way to the hospital, Petitioner said it had been "just like a regular night." (Tr. 49). He then stated that he was "going to be blamed for this because he's a boyfriend." (Tr. 49).

After arriving at the hospital, K.I. was examined by Dr. Chandra DeLorenzo. (Tr. 47-48). Following this examination, K.I. was transported to Sparrow Hospital in Lansing. (Tr. 48). Imhof rode in the ambulance which transported her daughter to Sparrow Hospital. (Tr. 48). Petitioner arrived at the hospital "a little while later." (Tr. 48). While waiting at the hospital,

3

Petitioner told Imhof, "no matter what happens, know that I love you and I love that little girl, and I didn't do this." (Tr. 49). Petitioner was subsequently accused of "touching" K.I., a charge which Imhof "didn't believe." (Tr. 50-51).

On April 28, 2000, Imhof accompanied a police officer to her home to gather evidence. (Tr. 51-52). Imhof told the officer that she did not believe that Petitioner would hurt her daughter. (Tr. 52). A search of Imhof's home failed to uncover any item that could have caused K.I.'s injuries. (Tr. 52). One of the items recovered during this search was a pair of K.I.'s panties, on which blood was observed. (Tr. 55). Imhof testified that she had not used these panties when trying to stop her daughter's bleeding. (Tr. 56). The search of Imhof's home also revealed the presence of blood on K.I.'s mattress. (Tr. 54-57).

**Steve Watson**

As of April 27, 2000, Watson was employed as a Calhoun County Deputy Sheriff. (Tr. 71-72). On that date, he and his partner were dispatched to Oak Lawn Hospital. (Tr. 72-73). After arriving at the hospital, Watson spoke with Petitioner. (Tr. 73-75). Petitioner told Watson that he picked up K.I. from the babysitter and drove home. (Tr. 75). After returning home, he asked K.I. if she wanted anything to eat or drink. (Tr. 75). K.I. declined, at which point Petitioner dressed K.I. in her nightgown and put her in bed. (Tr. 75-76). During this initial interview, Petitioner made no mention of removing K.I. panties. (Tr. 75).

According to Petitioner, he then started doing laundry and other household chores. (Tr. 76). K.I. later awoke and told Petitioner that "she needed to go to the bathroom." Petitioner took K.I. into the bathroom. (Tr. 76). Petitioner then observed a "drop of blood on the floor," but

4

he was not concerned about this because K.I. "had a scratch or cut on her leg that she had been picking at earlier in the day." (Tr. 76). Andrea Imhof then arrived home. (Tr. 76). According to Petitioner, he and Imhof both observed blood on K.I.'s leg, at which point Imhof examined her daughter and observed that "her vaginal area was covered in blood." (Tr. 76-77). Petitioner and Imhof then transported K.I. to the hospital. (Tr. 77). Petitioner made no mention of penetrating K.I.'s vagina with his finger or any other part of his body. (Tr. 96).

After talking with Petitioner, Watson followed Petitioner back to his residence to "try to recover some evidence, which would include the blue pajamas that she had worn from the babysitter's, and the night gown that [K.I.] had been placed into." (Tr. 77-78). Petitioner recovered the pajamas and nightgown and gave them to Watson. (Tr. 78). Watson asked Petitioner to also gather the underwear that K.I. had been wearing, but Petitioner was unable to locate them. (Tr. 78-79). An examination of K.I.'s nightgown revealed "discoloration" on the "bottom, left-hand side." (Tr. 79-82). There was no visible discoloration on K.I.'s pajamas. (Tr. 82-84).

On April 28, 2000, Watson accompanied Andrea Imhof (and a Child Protective Services caseworker) to Petitioner's residence to "continue the investigation and to do a more thorough search of the property and the interior of the residence to look for additional evidence." (Tr. 86-87). Watson examined the exterior of the residence and observed no evidence of forced entry. (Tr. 87).

In the master bedroom, Watson discovered "a pair of size four girl's underwear, which had a red discoloration which [he] thought was blood." (Tr. 87-88). The discoloration was not in the crotch area, but was instead "in the top, right section of the garment." (Tr. 90-91). Watson removed the sheet from K.I.'s bed, "which had a red discoloration where she had been laying." (Tr.

88).  Watson removed a section from K.I.'s mattress, "because the bodily fluid from the victim had absorbed down into the mattress."  (Tr. 88).  Watson also recovered "two gray, crusty-substance spots on the carpeting in [K.I.'s] bedroom" that Andrea Imhof described as "unusual."  (Tr. 88).

After recovering this material, Watson and Imhof searched the residence "to see if there was something that could cause an injury like this."  (Tr. 95).  They were unable to locate "anything, any evidence, of an object that could have done that."  (Tr. 95).  A search of Petitioner's and Imhof's vehicles uncovered no evidence.  (Tr. 95-96).

**Dr. Chandra DeLorenzo**

Dr. DeLorenzo testified that she had been a doctor for seven years and had been a pediatrician for the previous three years.  (Tr. 127-28).  The doctor testified that she examined K.I. at Oak Lawn Hospital at approximately 2:15 a.m. on the morning of April 27, 2000.  (Tr. 128-29).  Petitioner and Andrea Imhof were both present during the examination.  (Tr. 129).  According to the doctor, K.I. was "very quiet," "nervous," and "a little scared."  (Tr. 130).  When Dr. DeLorenzo asked K.I. "what had happened," she did not respond.  (Tr. 130-31).  The doctor then asked K.I. "if anything hurt," to which K.I. stated, "my wee-wee hurts" and placed her hands "in her genital area."  (Tr. 131).

The doctor asked Petitioner what happened to K.I.  (Tr. 131-32).  According to Petitioner when he picked up K.I. from the babysitter she "seemed to be acting normally."  (Tr. 132).  After arriving home, he changed K.I. out of her pajamas and put her in bed.  While changing K.I., Petitioner noticed "a spot of blood on her knee," but he "didn't seem to think too much about that" because K.I. had a sore on her knee which she had previously been "picking at."  (Tr. 132).

6

Petitioner put K.I. in bed and Imhof returned home "about an hour later." (Tr. 132). When Imhof

returned, K.I. awoke and said she had to use the bathroom. (Tr. 132). According to Petitioner, both

he and Imhof took K.I. to the bathroom, at which point "they noticed a lot of blood." (Tr. 132).

Dr. DeLorenzo then examined K.I. (Tr. 133-34). The doctor observed no marks on

K.I.'s head or chest. (Tr. 133-34). K.I. became "quite agitated" when the doctor began to examine

her genital area. (Tr. 134). The doctor testified that "it took a lot of talking to [K.I.] to get her to

trust me touching her; that I would not hurt her." (Tr. 134). The doctor was eventually able to

examine K.I.'s labia. (Tr. 134). According to Dr. DeLorenzo she "put [her] hands on the labia and

started to pull them apart, noticed a lot of blood coming out of the vaginal area, as well as several

clots, large clots, in that area." (Tr. 134). The doctor also testified that:

> And as I had gotten the labia apart, just slightly, at the very bottom,
> at what we call the 6:00 o'clock position, which laying on her back
> that would be the very bottom next to her anal area, was the skin was
> jagged, so there was obvious cut at that point. She got incredibly
> agitated at this point, so we put her legs together. With the active
> bleeding, I knew she needed to be transferred.

(Tr. 134-35).

Dr. DeLorenzo further testified that because of K.I.'s agitated state she was unable

to take any photographs or observe any internal injuries. (Tr. 135). Once she observed the active

bleeding, the doctor's primary concern was "to get [K.I.] stabilized to make sure she wasn't losing

blood too quickly" and then arrange to have her transported to Sparrow Hospital. (Tr. 140).

The doctor was asked to discuss "straddle" injuries, at which point the following

exchange occurred:

Q:     What is a straddle injury?

7

A:    A straddle injury is where someone will fall and basically straddle, like on a horse, where the legs are apart, and you come down and in the center, hitting the whole genital area.

Q:    Okay.  How is that able to cause an injury, and what sort of injury would you expect to see with a straddle injury on a girl of her age?

A:    On a girl her age, the straddle injuries usually cause a significant amount of bruising; they can cause small lacerations where the skin gets pinched, but with that, there is bruising as well.  There is usually bruising of the labia, the buttocks, and the outer tissues of the skin.

Q:    Okay.  Would there be bruising - would that bruising happen immediately or not?

A:    It would happen within minutes, yes.

Q:    Within minutes?  And why is that?  I mean, people can walk by a table and hit their arm on a table and get a bruise a day or two later?

A:    It's a significant crush injury due to the pressure between the object that you fall on, or straddle, and the bones on the inside.

Q:    So the skin will press against the bones and that will cause the bruising?

A:    Yeah.  The skin gets pinched between the bones and whatever you're straddling on, and that causes the bruising.

Q:    Okay.  And it can also cause lacerations and that sort of thing?

A:    Yes.

Q:    Did you see any sign of a straddle injury when you saw K.I.?

8

A:      No.

Q:      Did you see any sort of bruising, or anything like that, anywhere in her genital area?

A:      No.

Q:      Was that something that you did look for?

A:      Yes, I did.

(Tr. 140-42).

Dr. DeLorenzo was then asked about penetration injuries, at which point the following exchange occurred:

Q:      [W]ell, you've told us what a straddle injury is. Can you tell us what a penetration injury is and if they're in any way different?

A:      They are different. The straddle injury, the injuries are on the outside. They're the pinching between, and then any abrasion that might happen from the thing that you fall onto; whereas in a penetration injury, you can have some cuts or bruises on the outside, but they are much less likely. You get more bruising, lacerations, and tearing on the inside.

Q:      Is there a particular place that you expect to see penetration injuries inside a vagina, particular part as it relates to front or back, right to left?

A:      Usually the 6:00 o'clock position is most common for a penetrating type injury.

Q:      And what is that?

A:      The angle of force that is given in a penetrating injury is usually straight back on the person.

Q:      Wouldn't you expect, if it's some sort of penetration, say penetration with a penis, wouldn't you expect - or

9

finger, for that matter - wouldn't you expect to have injuries seen at the cervix?

A:    No.  Not likely.

Q:    Why not likely?

A:    The cervix is at an angle to the vagina, whereas the vagina would be angled up and back; whereas the cervix is usually on top of it, not directly behind, but angled this way.  So a lot of times you will go right past the cervix, back through the back of the vaginal wall.

Q:    Okay.  How much force does it take to tear through the vaginal wall into the anal opening; the rectal opening?

A:    That would take quite a bit of force because the vaginal opening, like I said, will accommodate, and it will stretch to quite a distance, so you would have to be breaking past that. . .of that skin in that area.

Q:    Is it possible to have a tearing of the vaginal wall into the rectum simply by touching that vaginal wall with a fingernail?

A:    No.

Q:    Can you demonstrate for the jury the type of force that would be necessary to break through, perhaps using your hand?  What sort of force are we talking about?

A:    It would be a fairly - if I could - fairly hard amount of force.  It would be, you know, not something like this.  It would be - I mean, you would really have to put some muscle behind it.  It would take quite a bit of force.

Q:    Okay.  Now, when you're using that example there, you're patting it, but we're talking about actually going inside the vagina.

A:      Correct.

(Tr. 145-47).

After completing her examination of K.I. and speaking with Petitioner and Andrea Imhof, Dr. DeLorenzo determined that "the story didn't go together for me." (Tr. 147). The doctor then informed Petitioner and Andrea Imhof that she would be contacting Child Protective Services. (Tr. 147). At this point, Petitioner stated, "you know this doesn't look good." (Tr. 147). Dr. DeLorenzo responded that, "well, I can't help it doesn't look good. You know, she does not look good to me." (Tr. 147). Petitioner then stated, "well, I was the last one with her alone before this happened." (Tr. 147).

**Jodi Reeves**

Reeves testified that she is a registered nurse, employed in the emergency department at Sparrow Hospital. (Tr. 159). Reeves testified that she was also qualified as a SANE nurse. (Tr. 160). According to Reeves, the SANE program "is a Sexual Assault Nurse Examiner Program, which is a nationally-recognized program and of Registered Nurses who receive extra training and education specifically taking care of sexual assault victims." (Tr. 160). Reeves testified that she had examined 57 sexual assault victims, "approximately" fourteen of whom were under the age of ten. (Tr. 160-62). Of these fourteen children, "most" were under the age of five. (Tr. 162-63). Reeves further indicated that most of the children she examined were girls. (Tr. 163).

On April 27, 2000, Reeves was on duty in the emergency department at Sparrow Hospital. (Tr. 173). Early that morning, Reeves was notified that K.I. was in-transit to the hospital and that "they needed a sexual assault examiner for evidence collection." (Tr. 174-75). Reeves

11

testified that her main role in K.I.'s care was "to do this evidence collection." (Tr. 175).

Reeves' examination of K.I. revealed the existence of a tear "of the wall between the rectum and the vagina." (Tr. 175-80). Specifically, Reeves testified that

> As part of the examination, prior to repair, the surgeon had his finger inside the anus to feel along the wall, the bottom wall. There was a tear in the rectum that went through - the tear from the vagina that went through the posterior wall of the vagina, through unto the rectum, and his fingers were visible. When he put his fingers in the rectum, the fingers were visible in the vagina.

(Tr. 180).

Reeves was then questioned about the nature of K.I.'s injury, at which point the following exchange occurred:

> Q:  If there is an injury to this back area that you saw and that you've shown us here, how would you characterize that injury? What would you call that injury?
>
> A:  It's a penetrating injury.
>
> Q:  A penetrating injury?
>
> A:  Um-hmm (affirmative)
>
> Q:  And is there anything unusual, in your opinion, as it relates to the penetration being through the posterior facet, back wall of the vagina? Anything unusual about that?
>
> A:  When there is injury to the posterior area, the posterior facet and the back wall of the vagina, that is generally associated, in children, that is a highly suspected, in all the journals and in all the articles, suspected of an abuse, generally because if a person is, say, standing, and falls on an upright object and basically impales himself, you will tend to see more injury on the interior or top portion of the - in the

12

labia,. . .into the clitoral area, and also to the anterior portion of the vagina, which is the top.

Q:    And why would you see it more at the top area? Because of the -

A:    Because of the way that the vagina tilts. It kind of tilts to the back a little bit.

Q:    Okay. Okay. The injury that you saw on K.I., is that consistent with a child that was laying down?

A:    Yes.

Q:    Why?

A:    Because if you picture somebody laying down, and this as the vagina, the injuries were at - were at this sort of an angle. And if you were standing up, to get that kind of an angle would be very difficult. So it's more - I mean, for anything, really, to - unless you had something this way that they impaled on.

Q:    Okay.

A:    It's to the back.

Q:    Just from the angle itself, that would be consistent with laying down?

A:    Yeah.

Q:    Laying down on her back, or on her front?

A:    Back.

Q:    Back. Okay. What would you describe as the amount of force that would be necessary to cause such an injury?

A:    It would require a significant amount of force.

Q:    And why is that?

> A:      There was a great deal of tearing.  Probably 85 percent of cases, we get no injury, at all.  Even with full penetration in that age group.  And this had significant injury, that went through the vaginal wall into the rectum, and that takes a great deal of force. That's muscle in between the vagina and the rectum.

(Tr. 184-86).


**Dr. Ronald Hirschl**

Dr. Hirschl is a pediatric surgeon who specializes in the repair of genital and anal injuries and abnormalities in children.  (Trial Transcript, Dec. 6, 2000, 4-6).  The doctor examined K.I. at Sparrow Hospital on April 27, 2000.  (Tr. 6-7).  Upon examination, Dr. Hirschl observed a tear of the perineum, leading from the anus to the vagina, as well as a tear in the vagina itself.  (Tr. 8-9).  The doctor described this as a "complex tear" in which the tissues "were not nicely cut and divided."  (Tr. 10).  Rather the injured tissues exhibited "a jaggered [sic] sort of pattern" which the doctor initially was unsure how to reconstruct.  (Tr. 10).  The doctor testified that in terms of the "force" or "stretch" associated with K.I.'s injuries, it was "almost the equivalent of a baby being born."  (Tr. 20-21).

Dr. Hirschl testified that K.I.'s injuries were such that when he placed his finger in K.I.'s anus, he could see his finger through her vagina.  (Tr. 11).  The doctor testified that "considerable force" would be necessary to inflict the injuries suffered by K.I.  (Tr. 13-16).  The doctor testified that it was "unlikely" and "beyond reason" that the injuries to K.I. were caused by penetration of a finger.  (Tr. 15-16, 45).  Dr. Hirschl testified that K.I.'s injuries could have been caused by a penis being "forced into the vagina."  (Tr. 46).  When asked whether K.I.'s injuries could

have resulted from Petitioner and/or K.I. "being startled and jumping," Dr. Hirschl responded that

such "doesn't sound like a reasonable explanation."  (Tr. 17).  The doctor testified that he had never

before seen "a penetration injury through the vaginal wall into the rectum."  (Tr. 46).


**Guy Picketts**

On the morning of April 27, 2000, Picketts, a detective with the Calhoun County

Sheriff's Department, spoke with Petitioner at Sparrow Hospital.  (Tr. 51-56).  Picketts asked

Petitioner if he would be willing to accompany him to the Calhoun County Sheriff's Department to

participate in an interview.  (Tr. 56).  Petitioner agreed.  (Tr. 56).  The interview was conducted in

Picketts' office.  (Tr. 57).  Officer Watson was also present.  (Tr. 57).  Before the interview started,

Petitioner was informed of his Miranda rights.  (Tr. 57).  Petitioner agreed to waive his Miranda

rights and speak with Picketts and Watson.  (Tr. 57).

When asked to describe in his own words what happened the previous evening,

Petitioner stated that after returning home from the babysitter he changed K.I. into a nightgown and

placed her in bed.  (Tr. 57-58).  Petitioner said that K.I. later awoke and stated that she needed to use

the bathroom.  (Tr. 59).  Petitioner lifted K.I. out of bed and she walked into the bathroom.  (Tr. 59).

After K.I. returned from the bathroom, Petitioner noticed "some blood running down her leg."  (Tr.

59).  It was at this point that Andrea Imhof returned home.  (Tr. 59).  When informed that K.I.'s

injuries were "traumatic" and suggested that she had been sexually assaulted, Petitioner responded

that "what he told [Picketts] was the way it was."  (Tr. 59).  During this initial interview, Petitioner

never made any mention that he touched or penetrated K.I.'s vagina.  (Tr. 62).  Following this

interview, Petitioner was placed under arrest.  (Tr. 62).

On May 2, 2000, Picketts again spoke with Petitioner.  (Tr. 64).  Picketts accompanied medical personnel to the jail to execute a search warrant to obtain a blood sample from Petitioner.  (Tr. 64-65).  Because Petitioner had already been arraigned, Picketts "had no intention of interviewing [Petitioner]."  (Tr. 65).  After the search was conducted, Picketts was speaking with one of the jail's supervisors when he noticed that Petitioner "was waving [him] over."  (Tr. 65-66).  Picketts and Deputy Miller then walked over to where Petitioner was being detained.  (Tr. 66).

Petitioner stated to Picketts that "he wished to speak to [Picketts] about the case."  (Tr. 66).  Picketts responded by telling Petitioner "that he should confer with an attorney prior to making any statements" and that it "would be in his best interest if he would do that."  (Tr. 66-67).  Petitioner, however, "insisted" on speaking to Picketts because he "wanted to tell [him] what really happened."  (Tr. 67).  Picketts again informed Petitioner that "it would be in his best interest to contact his attorney or an attorney prior to making any statements in regards to this case, because I told him he was charged with a CSC 1st, and the charges were serious."  (Tr. 67).  Petitioner responded "that he didn't want to talk to an attorney; that he was insistent that he wanted to make a statement to [Picketts], and so he was removed from his cell."  (Tr. 67).  Picketts, Deputy Miller, and Petitioner then entered a nearby interview room.  (Tr. 67).

Petitioner was again advised of his Miranda rights, which he agreed to waive.  (Tr. 67-68).  Picketts then reiterated to Petitioner "that it would definitely be in his best interest to contact an attorney prior to making a statement."  (Tr. 68).  Petitioner declined and again "insisted at that point in time he wanted to tell [Picketts] what really happened."  (Tr. 68).  The following exchange then took place:

> Q:     Okay.  What did Defendant say happened this time, in

16

this interview?

A:      Mr. Reincke, at that point in time, told me that he had picked [K.I.] up at the baby-sitter's; that he had gone home. Upon arrival at home, he changed her from her pajama outfit that she was wearing when he picked her up from the baby-sitter's into the Blue's Clues nightie. He told me that he had taken her panties off and he did not put any panties back on her. He had put her to bed. He went about doing chores, laundry. At some point in time, prior to Andrea's arrival, he had gone into the bedroom with, I believe, some clothes that he had folded up or in a clothes basket, and he took and - when he was in the room, she had said something and he asked her - oh, he asked her if she had to go potty, and she said no, and in his words, in a whimpery voice. At that point in time, he told me that he reached down with his left hand and he touched her vagina to see if she had wet the bed. It was then he said that when he did that, she jumped, he jumped, causing him to insert his second finger on his left hand into her vagina.

Q:      Did he say how far the finger went in?

A:      He indicated that he wasn't sure. It might have been the first knuckle or second knuckle. At that point, he took her to the bathroom. He said there was blood all over. He said everything got kind of crazy. He took her back into the bedroom, tried to get her panties back on her. He couldn't get them on, and at that point in time, Andrea had come home. He said, I believe, everything got crazy. Andrea wanted him to call - well, she examined her, said that she wanted him to call 911. He said that I can drive, and at that point they left and went to the hospital.

(Tr. 69-70).

17

**Sandra Hubbard**

Hubbard testified that she is married to Petitioner's brother and had known Petitioner for approximately 28 years. (Trial Transcript, December 5, 2000, 113). Hubbard testified that she has two children. (Tr. 113-14). She indicated that her children interacted with Petitioner "quite often" and "on occasion" spent the night with him. (Tr. 114). Hubbard testified that Petitioner was a "great uncle" to her kids and that he never acted inappropriately toward them. (Tr. 114). Hubbard indicated that she witnessed Petitioner interacting with K.I. "probably a dozen times or better." (Tr. 115). She never witnessed Petitioner take an "unusual interest" in K.I., act inappropriate toward her, or touch her in an inappropriate manner. (Tr. 115-16). Hubbard also observed no evidence that K.I. was afraid of Petitioner. (Tr. 116-17).

**Joe Hubbard**

Hubbard is Petitioner's brother. (Trial Transcript, Dec. 6, 2000, 87). Hubbard testified that he had observed Petitioner and K.I. on "quite a few" occasions. (Tr. 87). According to Hubbard, Petitioner treated K.I. "just like [s]he was his own daughter" and K.I. "treated him like he was her dad." (Tr. 88). Hubbard testified that never observed Petitioner engage in any inappropriate behavior with K.I. (Tr. 88). He further testified that K.I. did not appear to be afraid of Petitioner. (Tr. 88).

**Vern Jenks**

Jenks testified that he had served in the same Army Reserve unit as Petitioner since 1985. (Tr. 91). Jenks testified that he had observed Petitioner and K.I. interact on occasion. (Tr.

18

92).  According to Jenks, K.I. was not frightened of Petitioner and, in fact, exhibited affection toward him.  (Tr. 92-93)  Jenks also reported that he never observed Petitioner acting inappropriately with K.I.  (Tr. 92-93).

**Duane Reincke**

Petitioner testified that Andrea Imhof and K.I. moved in with him in August 1999.  (Tr. 97-101).  Petitioner testified that after K.I. overcame her initial shyness, the two of them "got along excellent."  (Tr. 106).  Petitioner testified that he occasionally cared for K.I. while her mother was at work.  (102-03).  Petitioner testified that he also helped potty train K.I.  (Tr. 103-04).  According to Petitioner, he, Imhof, and K.I. formed a family unit.  (Tr. 104-05).

As for the day on which K.I. was injured, Petitioner testified that he picked up K.I. from the babysitter shortly after 11:00 p.m.  (Tr. 106-07).  Petitioner then "went right home."  (Tr. 107).  Soon after arriving home, K.I. indicated that she was sleepy.  (Tr. 108).  After walking to her bedroom, K.I. changed out of the "full-length sleeper" she was wearing and into a "nightie."  (Tr. 107-09).  Petitioner said that he then removed K.I.'s underwear because he "was getting ready to do laundry."  (Tr. 109-10).  Petitioner did not give K.I. a clean pair of underwear to wear.  (Tr. 110).  After putting K.I. in bed, Petitioner brought her a cup of milk.  (Tr. 111-12).  He then left her bedroom and pulled the door "almost all the way" shut.  (Tr. 112).

Petitioner testified that he then started performing various household chores.  (Tr. 112).  Around 1:00 a.m., Petitioner entered K.I.'s room to put some clothes away and Petitioner noticed that K.I. "appeared to be awake."  (Tr. 112-13).  Petitioner asked K.I. "if she had to go potty."  (Tr. 114).  K.I. responded "no," in "kind of like a scared voice."  (Tr. 114).  According to

19

Petitioner, K.I. spoke in that tone of voice when she wet the bed approximately one week earlier. (Tr. 114).  Petitioner then asked K.I. "did you go potty."  (Tr. 115).  K.I. did not respond, at which point Petitioner "reached in between her legs. . .to see if she had wet the bed."  (Tr. 115).

According to Petitioner, as he reached toward K.I. "she made a jumping motion." (Tr. 116).  This startled Petitioner, who "lost [his] balance and started to fall toward the bed."  (Tr. 116-17).  Petitioner then "planted [his] hand and pushed off to stand back up."  (Tr. 117).  As Petitioner did this he "brushed [K.I.'s] legs" and "touched her private area."  (Tr. 117).  K.I. then started to cry and stated, "I have to go potty."  (Tr. 117).  Petitioner lifted K.I. out of bed and the two of them walked to the bathroom.  (Tr. 117-18).  Upon entering the bathroom, K.I. "went right to the toilet."  (Tr. 118).  Petitioner then noticed "droplets of blood on the floor, and on the foot stool that was in front of the toilet."  (Tr. 118).  After reassuring K.I. that "she was going to be okay," Petitioner then "turned around and ran out of the bathroom."  (Tr. 119).  Petitioner "grabbed a pair of underwear" which he was trying to put on K.I. when Andrea Imhof returned home.  (Tr. 119-20).

With respect to the statement Petitioner made to Detective Picketts on May 2, 2000, the following exchange occurred:

> Q:   Did you tell him that you thought - in the interview at the jail, the second interview, did you tell him that you thought that you had penetrated the young lady?
>
> A:   I had said that I was certain that that's what had happened, yes.
>
> Q:   Do you specifically recall it?
>
> A:   Telling him that I -
>
> Q:   No.  No.  Do you specifically recall penetrating the young lady?

A:     No.

Q:     Then why did you tell him that?

A:     Because they - they - Detective Pickett eliminated all
       the other possibilities, and I just assumed that it had to
       have been me.  There was just no other way.

Q:     You've had plenty of time to think about this.  Two-
       hundred and some days, right?

A:     Yes.

Q:     You agree that you were the only one in the house.

A:     Yes.

Q:     You agree that nobody snuck in through the window,
       did this, and snuck out.

A:     Yes.

Q:     Did you ever intentionally penetrate K.I.?

A:     No, I did not.

Q:     Did you ever penetrate her with your penis?

A:     No, I did not.

Q:     Did you ever penetrate her with a foreign object?

A:     No, I did not.

Q:     Did you ever penetrate her with your fingers, that you
       know of?

A:     No, I did not.  Not that I know of.

(Tr. 132-33).

Following a jury trial, Petitioner was convicted of First Degree Criminal Sexual

21

Conduct. (Tr. 209). Petitioner was sentenced to serve 30-60 years in prison, a sentence well in excess of the 81-135 month sentence prescribed by the Michigan sentencing guidelines. (Sentencing Transcript, Jan. 11, 2001, 3-23). Petitioner appealed his conviction to the Michigan Court of Appeals asserting the following claims:

I.      The trial court should have suppressed Mr. Reincke's statements to police where the police failed to make an audio or video recording of the interrogations.

II.     The trial court reversibly erred by qualifying a registered nurse to testify as an expert that the injury here was consistent with sexual assault.

III.    Resentencing is required because Mr. Reincke's sentence far exceeded the legislatively mandated sentencing guidelines without a substantial and compelling reason.

IV.     The trial court's failure to resolve Mr. Reincke's challenges to inaccuracies in the presentence report requires remand for correction of the report and/or resentencing.

V.      Defendant-Appellant was denied his constitutional right to the effective assistance of counsel during trial.

VI.     Defendant-Appellant was denied his state and federal rights to due process and a fair trial where the prosecutor engaged in misconduct in his closing argument to the jury.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Reincke*, No. 232662, Opinion (Mich. Ct. App., Dec. 6, 2002). Asserting the same claims, Petitioner then moved in the Michigan Supreme Court for leave to appeal. The court vacated the decision by the Michigan Court of Appeals and remanded the matter to that court "for reconsideration in light of

22

*People v. Babcock*, 469 Mich. 247 (2003)."[1]  *People v. Reincke*, No. 123121, Order (Mich., Nov. 7, 2003).  On remand, the court of appeals concluded that:

> Based on our review of the record, including the sentencing transcript, we conclude that the trial court articulated substantial and compelling reasons for a departure from the guidelines and that these reasons justified the sentence that the trial court imposed.  Therefore, we affirm.

*People v. Reincke*, No. 232662, Opinion at 1 (Mich. Ct. App., Jan. 27, 2004).

Petitioner subsequently moved in the Michigan Supreme Court for leave to appeal this determination.  The court denied Petitioner's request for leave to appeal, stating that "we are not persuaded that the questions presented should be reviewed by this Court."  *People v. Reincke*, No. 125731, Order (Mich., June 30, 2004).

On September 29, 2005, Petitioner submitted the present petition for writ of habeas corpus in which he asserts the following claims:

I.  Defendant was denied effective assistance of counsel.

II.  Defendant was denied due process because of prosecutorial misconduct.

## STANDARD OF REVIEW

Reincke's petition, filed September 29, 2005, is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.  The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court

---

[1]  In *Babcock*, the Michigan Supreme Court held that "[u]nder the statutory sentencing guidelines, a departure is only allowed by the Legislature if there is a 'substantial and compelling reason' for doing so."  *Id.* at 255.

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's

jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

<u>ANALYSIS</u>

**I.** **Ineffective Assistance of Counsel Claim**

 Petitioner asserts that his trial counsel failed to object to the imposition of a sentence which exceeded the guideline range.  Petitioner also claims that his trial counsel failed to request the appointment of an expert witness to testify for the defense.  Petitioner further asserts that his trial counsel failed to "object or question" Andrea Imhof.  Petitioner argues that these failures deprived him of the constitutional right to the effective assistance of counsel.  The Court disagrees.

 To establish that he was denied the right to the effective assistance of counsel, Petitioner must first establish that his counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Accordingly, it must be demonstrated that counsel's actions were unreasonable under prevailing professional norms.  *Id.* at 688.  In making this determination, however, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Id.* at 689.  Petitioner must further establish that his attorney's performance was prejudicial in that it denied him a fair trial.  *Id.* at 687.  This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so <u>manifestly</u> ineffective that defeat was snatched from the hands of probable victory."  *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (*en banc*), *cert. denied*, 113 S. Ct. 2969 (1993) (emphasis in original).

 At sentencing, Petitioner's counsel objected at length to manner in which the various offense variables had been scored.  (Sentencing Transcript, Jan. 11, 2001, 3-10).  According to

26

Petitioner's counsel, the guidelines (as scored by the court) resulted in a recommended sentence of between 81 and 135 months. (Tr. 16). As discussed at sentencing, however, the pre-sentence investigator recommended a sentence "way in excess of what the guidelines are."[2] (Tr. 16). In response to this recommendation, counsel argued that the court should impose upon Petitioner a sentence consistent with the guidelines. (Tr. 16-17). Accordingly, Petitioner's claim that his attorney failed to object to the imposition of a sentence which exceeded the guideline range is without merit.

Petitioner's claim that his counsel failed to "object or question" Andrea Imhof is likewise without merit. Petitioner has identified several lines of questioning which he asserts should have prompted an objection from his attorney. Petitioner has failed to identify (and the Court fails to discern) the basis for any legitimate objection to such questioning. As for Petitioner's statement that his counsel failed to "question" Andrea Imhof, such is contradicted by the trial record which reveals that Petitioner's attorney cross-examined Imhof, eliciting testimony favorable to Petitioner.

Finally, as for Petitioner's claim that his attorney should have requested an expert witness, Petitioner has failed to identify what type of expert witness his attorney should have requested. More importantly, Petitioner has failed to indicate how the services of an expert witness could have assisted in his defense or achieved a different result. Because Petitioner has failed to demonstrate that he was prejudiced by counsel's failure to request an expert witness, this claim is without merit.

The Michigan Court of Appeals found Petitioner's claims of ineffective assistance to be without merit. *People v. Reincke*, No. 232662, Opinion at 3 (Mich. Ct. App., Dec. 6, 2002).

---

[2]  The transcript does not indicate the sentence recommended by the pre-sentence investigator.

In light of the authority herein identified, the Court concludes that the decision of the Michigan

Court of Appeals is neither contrary to, nor involves an unreasonable application of, clearly

established federal law.  Furthermore, its decision was not based on an unreasonable determination

of the facts in light of the evidence presented.  As such, this claim presents no issue on which habeas

corpus relief may be granted.


II.             **Prosecutorial Misconduct Claim**

                Petitioner asserts that the prosecuting attorney engaged in misconduct, depriving him

of his constitutional right to a fair trial.  Specifically, Petitioner objects to two comments made by

the prosecuting attorney during his closing argument to the jury.  The first of which is as follows:

> This could be the millionth time he has penetrated a child.  He may
> have only, in his lifetime, penetrated [K.I.], or he may have
> penetrated tens of thousands of girls.

(Trial Transcript, Dec. 6, 2000, 171).

                The second comment to which Petitioner objects is as follows:

> I submit that the Prosecution has, and the elements of the case are
> these: 1) that it happened in Calhoun County, Michigan, in April
> 27th, 2000; and then that the Defendant engaged in a sexual act that
> involved entry into [K.I.'s] vagina by the Defendant's finger, or his
> penis, or any other unknown object.

(Tr. 172).

                As the Sixth Circuit has stated, "[w]hen a petitioner makes a claim of prosecutorial

misconduct, 'the touchstone of due process analysis...is the fairness of the trial, not the culpability

of the prosecutor.'"  *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993)

(quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).  The issue is whether the prosecutor's conduct

"so infected the trial with unfairness as to make the resulting conviction a denial of due process."
*Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).  Thus, even if the challenged comments were improper, habeas relief is available only where the comments "were so flagrant as to render the entire trial fundamentally unfair."  *Gillard*, 445 F.3d at 897.  When assessing whether an improper comment resulted in a denial of the right to a fair trial, the Court must consider the following factors: (1) the likelihood that the comments mislead the jury or prejudiced the accused; (2) whether the comments were extensive or isolated; (3) whether the remarks were deliberately or accidentally presented to the jury; and (4) whether the evidence against the accused was substantial.  *Id.*

To properly assess the comments to which Petitioner objects it is first necessary to examine them in their proper context.  The comments at issue (highlighted below) were contained in the initial portion of the prosecuting attorney's closing argument which was as follows:

> When you look at Defendant, folks, does he appear like a monster to you?  When you look at him, do you think when I see that guy, if I were to watch him walk down the street, I would just look away; he's monstrous to me.  I submit the answer to that question, of course, is no.  He looks like anybody else.  And I think that's maybe a little bit different from what we learned and what we teach our children sometimes.  Maybe growing up we have this idea that somebody who would think of doing such a thing to a child must look like the boogie man, must be scary, and it must be obvious just by talking to him that this is what he likes to do.  And I submit that that's not the case.  When you look at this fellow here, he looks like a normal guy.  Could be a good guy, most all his life.  One question that you will not be asked to answer in this case is do you think Defendant is a good guy or bad guy.  It's not the issue.  It's not the issue.
>
> We had witnesses who are friends of Defendant's family, that were members of his family, that got up and said I've never seen him act inappropriately in front of a child before.  He never did anything to my kids.  So I don't know what that's supposed to mean.  I don't

know what that sort of testimony or argument is supposed to mean to you folks.  Does it mean just because we don't know of any other times that he's done this, does that mean that he could never do it?  Of course not.  **This could be the millionth time he has penetrated a child.  He may have only, in his lifetime, penetrated [K.I.], or he may have penetrated tens of thousands of girls.**  And that is immaterial, if we're not focusing on April 27th, 2000.

So when we're talking about these witnesses that get up and say he couldn't do such a thing; he's just a normal guy; he's my friend; he's my brother; he's my brother-in-law.  When you hear people say that, I submit to you folks that, as the song goes, nobody knows what goes on behind closed doors, and that is especially true when we're talking about the sexual abuse of a child.  It's not something you go out and brag about.  This isn't, you know, the type of crime where we're going to have witnesses to.  It's not an armed robbery in front of a bunch of people.  People don't talk about their sex lives.  They don't talk about elicit sex lives, certainly.  If I were to ask any of you, during jury selection, to tell us about that, that sort of question would take you aback because that's not the type of thing that is discussed.  And so, of course, his friends, and family members, and to strangers even, he doesn't seem to be a child molester.  And, again, that's not the issue; is the guy a child molester.

The issue here, and what I want you to focus on and what the Judge will tell you to focus on, is as it relates to April 27th, 2000, did the Prosecutor prove the elements of the case?  **I submit that the Prosecution has, and the elements of the case are these: 1) that it happened in Calhoun County, Michigan, in April 27th, 2000; and then that the Defendant engaged in a sexual act that involved entry into [K.I.'s] vagina by the Defendant's finger, or his penis, or any other unknown object.**  It does not matter how much entry because any entry, no matter how slight, is enough.  It doesn't matter if the sexual act was completed, if there was penetration by his penis; it does not matter whether semen was ejaculated.  It doesn't matter.  Any entry into her vagina is enough.  Secondly, that [K.I.] be less than 13 years old at the time of the alleged act.  All of those things have been shown.  All of those things have been shown.  He entered her vagina, caused horrible injury.  According to Dr. Hirschl today, he has never seen an injury to that degree in 17 years of practicing medicine.  Seventeen years of practicing medicine.

It was an accident.  This, of course, had to be an accident.  Well,

there's no instruction you're going to hear about that excuses Defendant from engaging in this act if it's an accident. Well, one thing that the instruction does say is that Defendant must have engaged in a sexual act. And I submit to you that, you know, there's a reason for that, because sometimes people do put their fingers into little girls' vaginas and it's okay. Dr. Hirschl does it. It's not a sexual act. And that's the difference here. Is there a reason for this man to be putting his finger into this girl's vagina? Is he a doctor? No. Does he have a reason to do so? No. But it was an accident. He certainly didn't mean to do this, and of course it must be an accident because no one would ever want to do this. Why would anyone want to do this? And that gets back to one of those unanswered questions that I asked you to think about in jury selection. Those unanswered questions that you will have at the end of this case, will have in the jury room. The unanswered question in this case is why? If you're like me, or you're like most people, you have no idea why somebody would do such a thing. It makes no sense. What sort of sexual gratification could a person get from sticking his finger into a little girl's vagina? But there are people out there that do it. I don't know why. It happens.

(Trial Transcript, Dec. 6, 2000, 170-74).

Petitioner presented testimony from several individuals who possessed no knowledge of what occurred on April 27, 2000, or how K.I. was injured, but who instead testified that they had never witnessed Petitioner act inappropriately toward K.I. or any other child. Petitioner testified that he did not recall penetrating K.I. with his finger, penis, or foreign object. Petitioner further testified that even if he had penetrated K.I. with his finger it was not intentional. The prosecutor was certainly entitled to respond to this evidence. *See, e.g., United States v. Collins*, 78 F.3d 1021, 1039-40 (6th Cir. 1996). As evidenced by the lengthy quotation above, the prosecutor properly argued in response that the relevant question was not whether Petitioner was a bad person or whether he had engaged in similar conduct in the past, but instead whether Petitioner improperly penetrated K.I.'s vagina on April 27, 2000. The Court finds neither of the challenged comments improper. However,

31

even if these comments were inappropriate, Petitioner would still not be entitled to relief.

The Court finds it highly unlikely that the comments at issue mislead the jury or prejudiced Petitioner. The trial judge instructed the jury on the relevant law and reminded them that the attorneys' comments were not evidence. (Trial Transcript, Dec. 6, 2000, 194-206). The comments were isolated and constituted a very small part of the prosecutor's closing argument. Finally, the evidence against Petitioner was simply overwhelming. Thus, even were the Court to find that the challenged comments were inappropriate, Petitioner cannot demonstrate that such deprived him of the right to a fair trial.

The Michigan Court of Appeals rejected Petitioner's claim of prosecutorial misconduct. *People v. Reincke*, No. 232662, Opinion at 3 (Mich. Ct. App., Dec. 6, 2002). In light of the authority herein identified, the Court concludes that the decision of the Michigan Court of Appeals is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, its decision was not based on an unreasonable determination of the facts in light of the evidence presented. As such, this claim presents no issue on which habeas corpus relief may be granted.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Reincke's petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure

to file objections within the specified time waives the right to appeal the District Court's order.

*Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  March 13, 2008
_/s/ Ellen S. Carmody_____
ELLEN S. CARMODY
United States Magistrate Judge